130 P.2d 24

GRAY v. ESSLINGER.

No. 4703.

Supreme Court of New Mexico.

Sept. 22, 1942.

Rehearing Denied Nov. 6, 1942.

Second Motion for Rehearing Denied Dec. 31, 1942.

See 46 N.M. 492, 131 P.2d 981.

Newell & Scoggin, of Las Cruces, for appellant.

Whatley & Garland, of Las Cruces, for appellee.

SADLER, Justice.

The plaintiff as administrator of the estate of his deceased brother, Louis Linton Gray, appeals from a judgment of the district court of Dona Ana County entered on an instructed verdict for the defendant. As appellant, the plaintiff assigns a single error, namely, that the court erred in sustaining defendant's motion for an instructed verdict interposed at the close of plaintiff's case in chief. Under this claim of error, he argues two points, (1) that when reasonable minds may differ on the issue of contributory negligence, the matter is issuable and must be submitted to the jury; and (2) that if the defendant's negligence approaches wantonness by showing reckless disregard of human life, contributory negligence constitutes no defense. Since either point, if well taken, renders erroneous the action of the trial court in instructing a verdict for defendant and the first, certainly, and the second, contingently, will involve an analysis of the plaintiff's evidence, we turn at once to its examination.

The decedent, a resident of El Paso, Texas, who followed the trade of manufacturing jeweler, engraver and watch repairer, came into the small village of Mesquite in Dona Ana County from the nearby settlement of San Miguel around 4 o'clock on the afternoon of June 21, 1941. Mesquite is located on highway No. 85 extending through the village from north to south, being the principal thoroughfare between Las Cruces, New Mexico, and El Paso, Texas.

The business houses of Mesquite all are located on the east side of the highway facing west and paralleling the right of way of the railroad between Las Cruces and El Paso. The southbound bus from Las Cruces to El Paso is due in Mesquite about 8:30 o'clock in the evening. The decedent planned to board this bus for El Paso at 8:30 o'clock, if in the meantime he should not succeed in getting a ride to his destination with some passing motorist. Accordingly, he spent the intervening time walking up and down the row of business houses inquiring for motorists going his way and stopping occasionally to visit with some local business man or loiterer.

In the course of his stay in Mesquite, the decedent passed the tavern of Frank Parra two or three times, sometimes pausing to engage in conversation with the proprietor if he chanced to be near the front of his establishment. It was not until 8 o'clock in the evening, however, that he entered the tavern. He then complained of a disordered stomach and purchased a small glass of wine in the expectation of getting relief from drinking it. He sat on a stool near the bar sipping the wine and visiting with the proprietor for nearly half an hour. Indeed, he had consumed the first glass of wine and had ordered the second and had partly consumed it, when the proprietor suddenly cried out: "There goes the bus!"

The highway through Mesquite is 41 feet in width and is paved with asphalt. The bus stop is located south of Parra's tavern, directly opposite and across the street from Ripley's Cafe, that is to say, the bus ordinarily comes to a stop on the west side of the highway as it did on the occasion in question. There is no bus depot or station house at Mesquite.

Upon hearing Parra's exclamation, the decedent hurriedly left the stool on which he was sitting and rushed through the front door, running south paralleling the highway, but remaining just off the paving until he passed the second light pole located on the east side of the highway. From the time he ran out of the building until he reached the second light pole the headlights of a closely approaching automobile coming in from the south were plainly visible. The highway extends in a straight line for approximately two miles south of Mesquite and continues in a straight line north for a considerable distance. The view is unobstructed in either direction.

Perhaps not sensing either the speed or the nearness of the approaching car, the decedent, after hesitating momentarily at the second light pole, ran directly into the path of the on-coming car and, upon reaching approximately the center of the highway, was struck by it and instantly killed.

Mrs. Frank Parra, wife of the proprietor of the tavern, was an eye witness to this unfortunate tragedy and, as a witness for the plaintiff, gave in evidence the following account thereof, to-wit:

"Q. Just state what you saw the deceased, the man that was killed, state what you saw him do when he left your place, and what you did to enable you to see. A. I was with my husband there in the saloon and he was talking with my husband and he was drinking a small drink of wine—he didn't even finish the drink. He hadn't finished the drink when my husband told him, 'There goes the bus!' Then he got off the stool in a hurry and he went out the door and running and across the road; he was off the road on the left hand side, he was running and he called out twice for the bus to be held until he got there, and he ran off the road until he passed the second light pole, then he stopped there for a moment because I, too, saw that car coming with very bright lights, but he kept on across the road and it was just a moment and then I saw him in front of those

lights and I heard the screech of the tires on the pavement. That is all I saw.

\*   \*   \*   \*   \*   \*   \*   \*

"Q. You say he stopped momentarily. What did he do? A. I think he stopped to see if he could cross the road without being run over. He probably thought he could beat the car in crossing the road.

\*   \*   \*   \*   \*   \*   \*   \*

"Q. Could you see him plainly from the time he left your store until he arrived at that post? A. Yes, because there is light there with the saloon lights and the garage lights, everything is well lighted there.

"Q. At that time when he left there were there any cars or trucks along the east side of the highway? A. Not at that moment, no.

"Q. Was there anything to obstruct either your view or his view of the car which was coming up the highway? A. No, sir.

"Q. And that car was coming up from the south? A. Yes, sir, coming from the south.

"Q. Have you any idea as to the rates of speed of an automobile? A. I see them go by speeding, but I don't know.

"Q. Do you ride with your husband in an automobile? A. Yes.

"Q. Do you drive a car? A. No, sir.

"Q. Can you state with respect to that car that struck Mr. Gray, whether it was traveling fast or slow? A. I think it was traveling fast.

"Q. I believe you stated you heard the brakes? A. Yes, sir."

The body of decedent was either hurled by the impact or carried on the hood of the car a distance of approximately one hundred feet from the point where struck and deposited on the west side of the highway just off the paving.

The defendant was the driver of the Buick sedan which struck decedent and according to the testimony of several witnesses was traveling at an excessive speed. Estimates of the rate varied from the highest given of seventy miles an hour to that admitted by defendant of 50 to 55 miles per hour. Skid marks of the tires on the paving were clearly visible for a distance of one hundred forty-six feet from the point where the brakes were first applied to the point where the car came to a stop with rear wheels on the edge of paving and front wheels off the paving, facing in a southeasterly direction, almost directly opposite that in which it had been traveling.

The light pole, slightly beyond which point the decedent turned to cross the highway, is located near the northwest corner of the building occupied by and known as Ripley's Cafe. The decedent proceeded in a diagonal and southwesterly direction across the highway toward the bus. It was parked on the opposite side of the highway in a southwesterly direction from the point at which decedent turned to cross over. The brakes were first applied, as indicated by skid marks on the paving, directly in front of Ripley's Cafe.

Captain Carlos Salas of the State Police arrived at the scene shortly after the accident. He testified as a witness for plaintiff. The distance the car skidded, previously stated as one hundred forty-six feet, is based on measurements made by Captain Salas. He found the brakes on defendant's car in good condition and the paving was dry.

According to tables of the National Safety Council based on experience and given in evidence by Captain Salas, a car driven at 60 miles an hour will travel 80 feet per second. Driven 20 miles per hour, it will travel 29 feet per second. The "thinking distance" of the average motorist after seeing some object—the time within which it takes him to react by lifting his foot from the accelerator and applying it to the pedal of the brakes—is ¾ of a second, according to data in tables of National Safety Council. Thus, according to the testimony of Captain Salas, a driver traveling 60 miles per hour and reacting in ¾ of a second to some object coming within his vision, would travel 66 feet before applying the brakes.

When the plaintiff had rested, after producing testimony of which the foregoing is a fair summary, the defendant moved for a directed verdict upon three grounds. The third ground reminded the court that the plaintiff's own contributory negligence was a proximately contributing factor in producing his death and barred recovery. The trial court sustained the motion upon this ground and instructed a verdict for the defendant as already shown. A full review and consideration of the evidence leaves us satisfied of the correctness of the trial court's action unless contributory negligence constitutes no defense under the facts, a question to be later considered. We are not unmindful of the prevailing rule that plaintiff's contributory negligence, if any, ordinarily is a question for the jury. Notwithstanding this general rule, however, where reasonable minds cannot differ upon the question and they come readily to the conclusion that the plaintiff was negligent and that his negligence contributed proximately with that of defendant to cause the injury complained of, it should be so declared as a matter of law. Candelaria v. Atchison, T. & S. F. R. Co., 6 N.M. 266, 27 P. 497; Gildersleeve v. Atkinson, 6 N.M. 250, 27 P. 477; Morehead v. Atchison, T. & S. F. R. Co., 27 N.M. 349, 201 P. 1048; note, 41 A.L.R. 407; Caviness v. Driscoll Construction Co., 39 N.M. 441, 49 P.2d 251; Faustman v. Hewitt, 274 Mich. 458, 264 N.W. 863; State ex rel. Kansas City S. R. Co. v. Shain, 340 Mo. 1195, 105 S.W.2d 915; Koock v. Goodnight, Tex.Civ. App., 71 S.W.2d 927. We conclude, therefore, that plaintiff's contributory negligence bars recovery unless, as already indicated, the plea constitutes no defense under the facts disclosed by the record before us.

In considering this final question we are first met with defendant's contention that the allegations of the complaint are insufficient to inject wanton and willful misconduct as a bar to the defense of contributory negligence. In this connection, it is

to be remembered that punitive damages in the sum of $5,000 are sought and it seems obvious that the same allegations relied upon to admit evidence for the recovery of punitive damages are also put forward to support a denial of contributory negligence as a defense. Briefly, the complaint alleges that at about 8:30 P. M. on the night in question, with several cars parked on the east side of the main business street of Mesquite and the El Paso bound bus parked, facing south, in its usual parking place on the west side of said business street (being transcontinental highway No. 85), the defendant drove his automobile at a rate between sixty and seventy miles per hour through the business section of said village, past the bus which plaintiff was attempting to reach by crossing over from the east side of said street and struck and killed decedent, hurling his body a distance of approximately 140 feet; that the tires on said automobile skidded a distance of 146 feet after application of the brakes before the car came to a stop after swerving around to a direction opposite that from which it had been traveling; that the force of the impact was so terrific as practically to crush the decedent, breaking arms, legs, ribs and bruising and wounding decedent on the head and on various portions of his body; that the operation of said automobile by defendant in the manner alleged "indicated a reckless and wanton disregard of human life and constituted gross negligence" rendering defendant liable for punitive damages.

The defendant joined issue by filing an answer which denied negligence on his part and alleged that, if negligent, plaintiff's own negligence was a proximately contributing factor producing his death and barring recovery. The plaintiff's reply denying all new matter alleged in the answer placed the cause at issue and on pleadings thus framed the trial took place. The defendant took no action by motion or otherwise to question the sufficiency of these allegations either to support the claim for punitive damages laid in the complaint or to deny him the benefit of contributory negligence as a defense. We hold the allegations sufficient for both purposes as against the objection now and for the first time urged against them.

This brings us to a consideration of the question whether negligence of a character to indicate a reckless disregard of human life or other consequences, when shown by the evidence, will deny the defense of contributory negligence. In addition to the facts already recited some additional evidence disclosed by the record should be stated as bearing upon this issue. One Ramon Gonzales and his wife in another car followed the automobile driven by defendant into the village of Mesquite on the night in question. The Gonzales car was traveling at the rate of 65 miles per hour not quite one-half mile south of the business section of Mesquite and continued at that speed until just before it reached the scene of the accident, arriving there within 25 or 30 seconds after

it happened, when it slowed down and came to a stop. Ramon Gonzales, the driver of his car, testified that defendant's car passed him "like a bullet". The defendant's car would have to exceed the speed of a car traveling 60 miles per hour by as much as 20 miles in order to give the occupants of the car passed the momentary sensation that their own car was stationary or "standing still".

In addition to other testimony bearing on the question of the speed of defendant's car, at the moment of the impact, the following testimony concerning the injuries inflicted was given by the embalmer who cared for the body, to-wit:

"The skull was fractured, neck was broken, the ulna bone in the left arm was broken, and the tibia and fibula bones in the left leg were broken, the left ankle was broken, the right fibula bone was broken and the right ankle was broken; four ribs on the left side and internal injuries that were caused by the breaking of the four ribs puncturing the left lung."

. The parties agree that this court has never passed directly on the question whether so-called "wanton and willful" negligence denies to a defendant the benefit of contributory negligence as a defense. Counsel for the defendant, pointing to the fact that we do not recognize degrees of actionable negligence as held in Thayer v. Denver & R. G. R. Co., 21 N.M. 330, 154 P. 691; Pettes v. Jones, 41 N.M. 167, 66 P. 2d 967; and Archuleta v. Jacobs, 43 N.M. 425, 94 P.2d 706, insist that it is illogical and unsound to follow the doctrine, supported by abundant authority elsewhere, that wanton and willful negligence on the part of a defendant takes away contributory negligence as a defense. They cite and rely upon the cases of Universal Concrete Pipe Co. v. Bassett, 130 Ohio St. 567, 200 N.E. 843, 119 A.L.R. 646, and Wittstruck v. Lee, 62 S.D. 290, 252 N.W. 874, 92 A.L.R. 1361, as demonstrating their contention that to recognize this doctrine is to import into our law the doctrine of comparative negligence repudiated in effect by the Thayer, Pettes and Archuleta cases, cited supra, and never recognized in this jurisdiction.

■■ We do not think so. It is true that this court, in line with the great majority of the highest courts of other states (45 C.J. 1036, § 595), refuses to recognize the doctrine of comparative negligence. It is equally true that we have recognized or upheld the right to recover punitive or exemplary damages where gross negligence, malice or circumstances of aggravation are shown. Hagerman Irrigation Company v. McMurry, 16 N.M. 172, 113 P. 823; Colbert v. Journal Publishing Co., 19 N.M. 156, 142 P. 146; Stewart v. Potter, 44 N. M. 460, 104 P.2d 736. See, also, Henderson v. Dreyfus, 26 N.M. 541, 542, 191 P. 442.

In Colbert v. Journal Publishing Company, supra, the question of the right to recover punitive damages was said to be one of first impression and the right was challenged. But, we overruled the challenge, saying [19 N.M. 156, 142 P. 149]:

"With the contention of appellant, however, we are unable to agree. As stated in the brief of appellee under the common law of England, expressly adopted in this jurisdiction by statute, punitive damages were allowed in cases of tort where gross negligence, malice, or other circumstances of aggravation are shown, and until our Legislature provides a different rule upon the subject, it is our duty to declare and enforce the common-law rule."

Again, in the more recent case of Stewart v. Potter, supra [44 N.M. 460, 104 P.2d 740], we said: "We are committed to the almost universally recognized doctrine of punitive damages (Colbert v. Journal Pub. Co., 19 N.M. 156, 142 P. 146), though we did not there decide, for the reason the question was not properly presented, the circumstances under which such damages would be imposed upon the principal for acts of the agent."

The McMurry and Colbert cases, sustaining the right to recover punitive damages, both antedate the Thayer, Pettes and Archuleta cases in which we refused to recognize different degrees of actionable negligence. Stewart v. Potter, again sustaining the right to punitive damages, follows these cases in point of time but does not cite them. In other words, neither group of cases takes notice of the other, but it is unreasonable to assume that in deciding one group of cases we would not have noticed the other group, if they had been deemed in conflict.

As a matter of fact, there is no conflict between them. The Thayer, Pettes and Archuleta cases simply hold that we do not recognize degrees of actionable negligence. Negligence as a basis for the recovery of compensatory damages, if actionable at all, is no more so because malice, circumstances of aggravation or reckless disregard of consequences, appear in its commission. This is what is meant and all that is meant in our previous declarations that we recognize no degrees of actionable negligence. Such a holding does not repudiate the doctrine, however, that such evil intent, reckless disregard of consequences or circumstances of aggravation may attend commission of the tort relied upon as to warrant the recovery of punitive damages and the denial to the wrongdoer of the defense of contributory negligence.

As already shown, we have heretofore sustained the right to recover punitive damages where the negligent act is of the character just stated. And, by the great weight of authority, if the negligent act be of this kind, it has the like effect of denying to a defendant the right to interpose contributory negligence of the plaintiff as a bar to recovery. 45 C.J. 981, § 533, under topic "Negligence", and cases cited; Annotation in 38 A.L.R. 1424, supplemented in 72 A.L.R. 1357.

The argument of counsel for appellee that to recognize this doctrine is to import into our law the doctrine of comparative negligence is refuted by what we already have said. Furthermore, it may be mentioned that as shown by a discussion of the subject of comparative negligence in 45 C.J. 1036, § 595, under topic "Negli-

gence", only two or three states recognize the doctrine, whereas twenty-six states are listed under Note 50 in 45 C.J. 981. as recognizing and enforcing the rule that contributory negligence is no defense where the negligent act was committed under aggravating circumstances. Practically all of these states refuse to recognize the doctrine of comparative negligence.

In its judgment in this case, after reciting the sustaining of defendant's motion for a directed verdict on the ground that plaintiff was contributorily negligent, the court continues: "* * * The court being of the opinion that irrespective of whether or not it might be said that there was evidence in the case tending to show that the defendant was guilty of gross or wanton negligence under the complaint for punitive damages pleaded and argued by the plaintiff, still the defendant's motion on said third ground should be sustained."

It thus appears that the trial court refused to recognize the doctrine which we here sustain that a defendant's negligent act may be committed under such aggravating circumstances as to deny to defendant the right to interpose plaintiff's contributory negligence as a defense. In so holding, the trial court erred. The stat-utory speed limit through the business district of the village of Mesquite is fixed at twenty miles per hour. 1929 Comp. § 11-804 (b) subsection 5, as amended by L. 1933, c. 118, § 1, as amended by L.1941, c. 56, § 1. We do not hold the mere fact that a defendant's negligence violates a statutory regulation will subject him to punitive damages and deny him the right to plead contributory negligence. It is merely a circumstance to be considered along with all other evidence in determining whether the act complained of is of such character as to warrant the infliction of punitive damages and the denial of the defense of contributory negligence.

It follows from what has been said that the judgment of the trial court must be reversed and the cause remanded with directions to the trial court to set aside its judgment and award the plaintiff a new trial upon all issues.

It is so ordered.

BRICE, C. J., MABRY and BICKLEY, JJ., concur.

ZINN, J., being absent, did not participate.